Dick Harry ELLIOTT, Appellant,

v.

William DARBY and Otis J. Reser, d/b/a
Darby-Reser Motor Co. and Federated Mu-
tual Implement and Hardware Insurance
Company, Respondents.

No. 8222.

Springfield Court of Appeals.

Missouri.

Sept. 10, 1964.

Clyde G. Meise, Mitchell & Meise, Kansas City, for appellant.

Russell D. Jacobson, Max W. Foust, Kansas City, for respondents.

HOGAN, Judge.

This is an appeal from an order of the Industrial Commission denying compensation to the appellant under the provisions of the Workmen's Compensation Law.[1] The trial court has affirmed the award, and the employee has appealed to this court as provided by Section 22, Article V, of the Constitution of 1945 and Section 287.490 (2). The Commission has found that the appellant did sustain a "personal injury by accident," but that the injury did not arise "out of and in the course of his employment," as required by Section 287.120 (1), to make the accident compensable.

In brief sketch, the facts are that the appellant—to whom we shall refer as the claimant—was, at the time of the accident in question, working for the employer as a mechanic, "service manager" and "parts manager." The employer's business was described as being "sales and service of new Ford cars and trucks and of used cars and trucks." Although the claimant was employed principally as a mechanic, he also had certain supervisory duties and was employed as a welder; in addition, he was in charge of the employer's wrecker service, which was operated on a 24-hour basis.

By agreement with the employer, Mr. Elliott received one-half the charges made for wrecker calls, which he took at all hours, though the claimant's normal working day ran from 7:30 A.M. to 5:30 P.M. It is apparent from the record that the claimant was a trusted employee and that he was left in charge of the business in the employer's absence.

Some time prior to the summer of 1959, a number of townspeople, some of whom were customers of the employer, had formed a group known as the Osceola Boat Club. Apparently this club was never formally organized, and its activities were principally social in nature, though there is some indication that the members of the club were attempting to promote recreational and tourist activity along the Osage River at Osceola, where the employer's business was located. The members of the club undertook to construct a floating boat dock about this time, and there is evidence indicating that the dock, when completed, would be available for community use. The employer, however, was not a member of the boat club, nor, he testified, had he ever been approached or solicited for a contribution of funds or services toward construction of the dock.

About the middle of August 1959, Mr. Elliott was approached by one of the members of the boat club, a Mr. Toalson, and was asked if he would be willing to assist in the construction of the proposed boat dock by welding some large barrels (actually 50-gallon oil drums) together as pontoons upon which the dock would float. We gather from the record that the actual process of construction of these pontoons involved spot welding the barrels end-to-end in units of six barrels, and then welding triangular pieces on top of the assembled unit as braces, to which the wooden floor of the dock could be attached. Mr. Elliott testified that he considered the construction of the dock to be a "community deal," and understood that neither he nor

1. Chapter 287, RSMo (1959), V.A.M.S. All references to statutes and rules are to RSMo (1959), V.A.M.S. and V.A.M.R., unless otherwise noted.

the employer would receive any compensation for the work he was to do. It also appears that he had never been given permission to donate the employer's services without compensation, and that the employer, at least initially, had no knowledge that Mr. Elliott had undertaken this particular project.

A Mr. Gordon, engaged "in the feed business" in Osceola, furnished 27 or 28 of the large barrels, and about the middle of August, working on the employer's premises, and using at least in part machinery and materials belonging to the employer, Mr. Elliott began work on the pontoons. The record indicates that he worked "three or four" mornings before regular working hours and up until 8:00 A.M., and "one or two nights a week," on the project for about two weeks before he sustained the accident in question, and that part of the dock had been completed and placed in the water by August 31, when Mr. Elliott was injured. During this two-week period, the barrels were stored on the employer's premises, and the record makes it clear that Mr. Reser (the managing partner of the business) was aware of what Mr. Elliott was doing. Reser's testimony, which is somewhat equivocal, was that he "* * * assumed at that time that he [Elliott] was doing the welding when he was not employed by me during regular hours," and that he had "* * * said nothing to him [Elliott] about it as pertaining to him, to do it or not to do it." Mr. Reser testified, and advised the referee, that "you would have to assume that I either approved or didn't disapprove because I would have had the authority to tell him to quit," but also stated that "it was my understanding that he [Elliott] was doing the work. * * * I didn't take the job." Mr. Reser did say —and the appellant lays much stress on the statement—that he felt he was contributing Mr. Elliott's services, and "* * * I think he feels that way."

In any event, on the afternoon of August 31, near the end of the work day, Mr.

Elliott undertook to finish the project. There was "no other work in the shop at the time," so, according to the claimant, Reser said "that I had a lot of welding to do * * * [and] had better get started on it," although, as Reser recalled, he said "if you are going to do the welding, you just as well get started on it so you can get the job completed." But however that may be, the claimant returned to work shortly after 6:00 P.M. to finish the welding. He had been working only a short time when one of the barrels exploded, apparently from "the gas that had built up in it," and he sustained severe and disabling injuries.

As material here, the findings of the Industrial Commission were as follows:

"* * * Neither Elliott or Reser were members of the Boat Club. The record is clear that Reser's prior consent, permission or *acquiesance* was not secured in connection with the project.

"In any event, the oil drums were subsequently delivered to Reser's premises. That Reser knew of this and Elliott's subsequent work thereon is abundantly clear. With the exception of one 30 minute period, Elliott's labors on building the dock were performed before and after his usual, ordinary and customary working hours. In these after-hour labors he was not paid by Reser. In building the dock Elliott used an electic welder belonging to himself and an acetylene welder belonging to Reser. Reser furnished all the welding rods used on the job albeit unknowingly. On the evening of August 31, 1959, Elliott was working after hours on the docks. While so engaged, one of the oil drums exploded and he sustained serious injuries.

"The evidence indicates that Reser had not received and had no reason to expect (not having been a party to Elliott and Toalson's agreement) any advertising or publicity in connection

with building or erecting the boat dock.

"It is the employee's *contentious,* if we correctly understand his position, that Reser's failure to actually prohibit Elliott from working on the dock on the employer's premises (after knowledge of the same) amounted to a ratification, condonation or *acquiesence* which adopted Elliott's acts in such a manner as to cause the accident to arise out of and in the course of the employment. Or alternatively, that the benefit of Elliott's labors inured to the good will of Reser's business in such a way as to achieve the same legal effect.

"We find and believe that at the time of the accident the employee was not performing any work required by his employment; that he was not performing any duty of his employment; that he was not engaged in doing something reasonably incidental thereto and that his accident did not, therefore, arise out of and in the course of his employment."

In their briefs, both parties vigorously argue the effect of the evidence. The appellant maintains that the injury must be said to have been sustained while he was acting in the course of his employment, because: 1) he was under 24-hour call, at least for wrecker service; 2) he sometimes acted in a "managerial" capacity; 3) he had received instructions from Mr. Reser to finish the welding project, at the time he was injured; 4) the employer testified in substance (as indeed he did) that both he and the claimant believed the claimant's services were being donated toward completion of the boat dock; and 5) Mr. Reser retained the right to control the means and manner in which the work was being done, and, in Reser's words, "* * * I would have had the authority to tell him to quit," but instead he agreed to and encouraged the performance of the work

by the claimant. The force of this evidence, as we understand the claimant, is to demonstrate conclusively that the employer had temporarily enlarged the scope of the claimant's employment to include the welding project, and since the claimant was performing an act for the mutual benefit of the employee and employer, the accident must be considered compensable.

Respondents, on the other hand, argue that the activity in which the claimant was engaged was clearly outside the scope of the employment contract, because: 1) the claimant received no pay for the welding; 2) the work was different from that in which he ordinarily engaged; 3) almost all the welding was done outside regular working hours; 4) the claimant was never directly ordered or authorized to do the welding, nor was he given any instructions as to how to do it; 5) Mr. Elliott had no authority to undertake the welding project on behalf of the employer; 6) the employer had no control over the claimant while he was doing the welding; 7) both the claimant and Mr. Reser regarded it as being a donation of the claimant's skill on his own, but not his employer's, behalf.

█ The very tenor of the arguments here and the duplication of authority in the briefs illustrate the dilemma with which one is confronted in attempting to apply general principles to a specific factual situation in a case of this kind. Though of course the general question to be resolved is whether the claimant's injury arose "out of and in the course of [his] employment," as required by Section 287.120(1), even a superficial examination of the authorities shows that a determination whether an injury comes within the quoted phrase usually involves the resolution of a factual, rather than a legal, question, and often nothing more precise and illuminating can be said than to state that each case must be decided upon its own particular facts. Heaton v. Ferrell, Mo.App., 325 S.W.2d 800, 803–804. In the case at bar, the testimony of the only two well-informed witnesses to

the facts—the claimant and his employer— is often inconsistent and somewhat contradictory. It is readily apparent from the record that, upon the evidence, conflicting inferences were permissible. In such a case, the Commission has a choice, just as it does with the credibility of witnesses,[2] and we must view the record in the light most favorable to the Commission's award.[3]

We agree that the employer's liability is not limited to those duties or that work which the employee was originally engaged to perform, or to the employee's usual work; there is no doubt that the contract of employment may be enlarged or broadened if the employer directs the performance of additional duties or acts outside the usual scope of employment.[4] Generally speaking, however, injuries sustained while the employee is acting in his own interest, or in the interest of a third person, are not compensable, 58 Am. Jur., Workmen's Compensation, Section 235, pp. 740–741,[5] and the mere fact that permission is given to the employee to perform an act or engage in additional activity does not necessarily broaden the scope of employment, even though such permissive activity may bear some relation to the employment.[6] In the case at hand, the employer was not present when Mr. Toalson first secured the claimant's agreement to weld the pontoons. Although at one point in the record Mr. Reser did answer affirmatively when he was asked if he felt he was contributing Mr. Elliott's services, at another point he said that " * * * it was assumed by me that he [Elliott] was doing the welding when he was not employed by me during regular hours * * " and Mr. Reser also stated that he never directed Elliott either to participate or not to participate in the boat dock project. He denied, at one point, that he had ever been solicited for or agreed to a donation of money, labor or materials toward the construction of the dock, and he expressly denied that Mr. Elliott had any authority to make such a donation. It was for the Commission to decide what inference was to be drawn from the evidence presented, Shrock v. Wolfe Auto Sales, supra, n. 2, 358 S.W.2d at 815, and we think the Commission might reasonably have concluded that Mr. Reser merely tolerated the claimant's participation in the dock-building project, without actually approving or en-

2. Shrock v. Wolfe Auto Sales, Inc., Mo., 358 S.W.2d 812, 815–816 [3–5]; Monical v. Armour and Co., Mo., 307 S.W.2d 389, 394 [6, 7]; Greer v. Missouri State Highway Department, Mo.App., 362 S.W.2d 773, 779 [5, 6]; Sams v. Hayes Adhesive Co., Mo.App., 260 S.W.2d 815, 819 [3, 4]; 100 C.J.S. Workmen's Compensation § 763(5), pp. 1202–1204.

3. Snowbarger v. M.F.A. Central Co-operative, Mo., 349 S.W.2d 224, 225–226 [1, 2]; Brown v. Anthony Manufacturing Co., Mo., 311 S.W.2d 23, 27 [1, 2]; Greer v. Missouri State Highway Dept., supra, 362 S.W.2d at 779 [5, 6]; Heaton v. Ferrell, supra, 325 S.W.2d at 802 [1].

4. Graves v. Central Electric Power Co-operative, Mo., 306 S.W.2d 500, 504; Dershowitz v. Ford Motor Co., 327 Mich. 386, 41 N.W.2d 900, 902–903 [4]; Weidenbach v. Miller, 237 Minn. 278, 55 N.W.2d 289, 296–297 [1–3]; Stepan v. J. C. Campbell Co., 228 Minn. 74, 36 N.W.2d 401, 403 [2]; McAdams v.

Canale, 200 Tenn. 655, 294 S.W.2d 696, 699–701 [4]; 99 C.J.S. Workmen's Compensation § 217, pp. 717–719.

5. This is, of course, subject to the qualification that employees who engage in acts ministering to their personal comfort, such as eating, drinking, washing, etc., in the time and space limits of their employment, do not ordinarily leave the course of their employment. See 1 Larson, Workmen's Compensation, § 21, et seq., p. 297.

6. Stout v. Sterling Aluminum Products Co., Mo.App., 213 S.W.2d 244, 248 [9, 10]; Dunnaway v. Stone & Webster Engineering Corp., 227 Mo.App. 1211, 1216, 61 S.W.2d 398, 400; Gaumer v. Industrial Commission, 94 Ariz. 195, 382 P.2d 673, 674–675 [3, 4]; State Compensation Insurance Fund v. Industrial Accident Commission, 43 Cal.App.2d 328, 110 P.2d 681, 682 [1, 2]; Gibson v. Blower's Paint Service, 140 Pa.Super. 216, 14 A.2d 154, 157–158.

couraging it, and without giving any specific direction to the claimant.

■ As an ancillary proposition, the appellant quotes from Wamhoff v. Wagner Electric Corp., 354 Mo. 711, 190 S.W.2d 915, 161 A.L.R. 1454, and urges upon this court that since the claimant was performing an act for the mutual benefit of the employer and employee, the injury sustained should be held compensable, even though the welding project involved activity outside Mr. Elliott's regular duties. The respondents, again arguing in terms of the proof presented, contend that the boat dock project cannot reasonably be said to have benefited the employer even indirectly. In this connection, the Commission has found in its conclusions of law that "* * * the speculative and intangible benefits that the employer might or could obtain from the creation of good will by virtue of Elliott's construction of the boat dock are insufficient to sustain the proposition that the relationship of master and servant existed at the time of the rendition of such services or, alternatively, that an accident sustained in the rendition of such services arose out of and in the course of the employment. * * *"

It is true that the nature or quality of an act causing an injury is an important consideration in determining the compensability of the injury, particularly in those cases where the employee is engaged in some permissive activity outside his regular duties. It is sometimes said that if in fact such permissive activity serves the interest of the employer, or is engaged in for the mutual benefit of the employer and employee, then an injury arising out of such activity may be considered compensable.[7] This is one aspect of the so-called "indirect benefit" or "mutual benefit" rule. But the fact that the employee's activity may incidentally result in some benefit to the employer does not necessarily bring it within the scope of the employment. 58 Am.Jur., Workmen's Compensation, Section 239, p. 744. There is, to be sure, some indication upon this record that some of the members of the Osceola Boat Club were past or potential customers of the Darby-Reser Motor Company, and we assume it might be argued that, in a small community, any gratuitous service performed on behalf of the employer could create some public "good will" in the broadest sense. However, there was no advertising of the employer's contribution to the project, and the evidence is susceptible to the interpretation that the primary purpose of the boat club was to engage in social activity, and not to promote business activity in the community. The employer at one point denied that he was interested in the boat club or the dock project, even indirectly. Certainly the claimant was not engaged in activity which the employer had encouraged in order to develop the employee's skill, as was true in the Wamhoff case, supra, 354 Mo. at 718, 190 S.W.2d at 919 [8], nor was he cultivating the good will of a prospective customer pursuant to specific instruction, as was the case in Ohlsen v. J. G. Dill Co., 222 Minn. 10, 23 N.W.2d 15, 18–19 [3] [4], nor can it be said that he was engaged in some humanitarian or emergency mission, as was the case in Graves v. Central Electric Power Cooperative, supra, n. 4, 306 S.W.2d at 504, and Scott v. Rhyan, 78 Ariz. 80, 275 P.2d 891, 893–894 [3–6] [7–8]. It is true that some courts purport to find an "indirect benefit" in activity of the employee which apparently has served no purpose of the employer other than to promote the good will of the general public, 1 Larson, op.cit., Section 27.22(b), pp. 411–412, but in our view, the "concurrent benefit" principle

7. Wamhoff v. Wagner Electric Corp., supra, 354 Mo. at 718–719, 190 S.W. 2d at 919 [9]; Gaumer v. Industrial Commission, supra, 94 Ariz. 195, 382 P.2d at 675 [5]; Robbins v. Jackson, 232 Ark. 658, 339 S.W.2d 417, 419–420 [1]; Smith v. Seamless Rubber Co., 111 Conn. 365, 150 A. 110, 111 [2, 3], 69 A.L.R. 856, 859; Farnham v. Labutis, 147 Conn. 267, 160 A.2d 120, 122 [3–7]; Dershowitz v. Ford Motor Co., supra, 327 Mich. 386, 41 N.W.2d at 902 [4].

cannot be applied without limitation. Eventually, the indirect benefit to the employer becomes so tenuous as to be imperceptible, see 1 Larson, op.cit., Sections 20.20, pp. 296–297, and 27.22(b), pp. 411–412; Gaumer v. Industrial Commission, supra, 94 Ariz. 195, 382 P.2d at 675 [5], and we agree with the Commission that in the present case any benefit which might have accrued to the employer because of the claimant's participation in the boat dock project is so speculative and remote that the mutual benefit doctrine cannot be reasonably applied.

■ We have examined the record and we conclude that the Commission's findings are supported by competent and substantial evidence and are not contrary to the overwhelming weight of the evidence. We therefore consider that the judgment should be affirmed, and it is so ordered.

RUARK, P. J., and STONE, J., concur.