PITTMAN, Judge.
In December 2009, Johnnie L. Odom filed a complaint seeking benefits under the Alabama Workers’ Compensation Act, § 25-5-1 et seq., Ala.Code 1975 (“the Act”), on account of injuries he suffered from rattlesnake bites on his hands, which injuries, he alleged, arose out of and in the course of his employment with Mercy Logging, LLC (“Mercy”), and rendered him permanently and totally disabled. Odom further alleged that Mercy had paid him no compensation benefits and none of his medical expenses, which expenses totaled over $300,000. Mercy answered the complaint and denied that Odom’s injuries were compensable under the Act.
Following a bench trial, the trial court entered a judgment determining that Odom’s injuries were compensable; finding that Odom was permanently and totally disabled and awarding him benefits under the Act; and finding that Odom had incurred reasonable and necessary medical expenses of $310,994.57, for which Mercy was liable. The trial court further determined that the Alabama Medicaid Agency had paid a portion of Odom’s medical ex *910 penses and was entitled to reimbursement. The trial court awarded Odom’s counsel an attorney’s fee of 15% of Odom’s accrued disability benefits and future disability benefits reduced to present value. It also awarded Odom’s counsel an additional attorney’s fee based on the “common-fund” theory. The trial court concluded that Odom’s counsel had created a fund consisting of the unpaid medical expenses that were owed to Odom’s medical providers, less the deduction for the portion of those expenses that had been paid by the Alabama Medicaid Agency, from which fund Odom’s counsel was entitled to an attorney’s fee of 40%.
Mercy appeals, arguing (1) that the trial court erred in concluding that Odom’s injuries arose out of and in the course of his employment and (2) that the additional attorney’s fee awarded to Odom’s counsel was not authorized by the Act or by the common-fund theory.

Factual Background,

At the time of the trial of this case in May 2011, Odom was a 46-year-old high-school graduate who had been working in the logging business for more than 20 years. He began working for Mercy’s predecessor, Perritt Logging, in February 2009. On the date of his injury, Odom was employed as a log-truck driver for Mercy; his duties included trimming, binding, and flagging loads and delivering the loads to timber and paper mills. On the morning of September 24, 2009, Odom and two other employees, Michael Raines and Riley Nelson, who were part of a logging crew under the supervision of crew foreman Aaron Perritt, the son of Mercy’s owner, Winston Perritt, drove their personal vehicles and parked them at a service station in Brewton, where they were met by Aaron Perritt, who was driving the labor truck for Mercy. Perritt transported the logging crew in the labor truck to the job site where Mercy was cutting timber. The site was adjacent to a paved road in Monroe County, 59 miles from Brewton. The crew worked until 5:00 p.m. that day and then, at Perritt’s instruction, returned to the labor truck for the ride back to Brewton, with Perritt driving the truck. Perritt drove north of the job site for a short distance to retrieve one of two “Trucks-Entering-Roadway” signs that had been placed on the road to warn traffic and then turned the vehicle around and drove south to retrieve the other sign. Two or three hundred yards beyond the point at which he had retrieved the second sign, Perritt saw a diamondback rattlesnake on the paved road in the northerly lane of traffic.
When Perritt saw the snake, he swerved the truck towards the snake in an attempt to run over it and kill it. When asked why he had intended to kill the snake, Perritt replied: “It’s just [a logger’s] nature to kill [snakes] because we feel they’re a threat ... in the woods.” Odom agreed that snakes are an occupational hazard to loggers in the woods. Perritt stated that it had not been uncommon for him and his crew to encounter rattlesnakes in the woods, that he had killed 20 to 40 snakes while working, and that his father had kept a gun in his truck to shoot snakes. Perritt added that, several months earlier, when he had been driving a work crew away from a job site in the labor truck, he had stopped the truck so that one of the employees could kill a snake. Perritt stated that he had had a habit of running over snakes whenever he saw them on the road and that he had considered the snake he had seen in the road on September 24, 2009, particularly dangerous because it was in an area that was adjacent to (and its head was pointing in the direction of) the job site where he and his crew would be working the following day.
*911 As Perritt veered the truck toward the snake to run over it, either Raines or Nelson called out: “Don’t kill it; let’s catch it.” Perritt then steered the truck away from the snake, stopped the truck on the side of the road a few feet past the snake, and turned off the ignition. When Perritt was asked why he had stopped the truck, he said: “I don’t know. Just being a country boy, I guess; they said, ‘let’s catch it.’ I mean, I wasn’t going to put my hands on it, but....” When Perritt stopped the truck, all four men exited the truck, and, according to Odom, Nelson bent over the snake to catch it with his hands. Odom (who stated that his father had taught him how to catch snakes, that he had caught as many as 100 snakes in the past, and that he had never been bitten by a snake) testified that it had appeared to him that Nelson did not know how to catch a snake and was in danger of being bitten. Therefore, Odom said, he had instructed Nelson to “pin” the snake with a stick. Raines retrieved a forked stick and handed it to Odom, who placed the stick behind the snake’s head. Perritt testified that, when he saw the snake strike at, or bite the stick, he told Odom not to catch the snake, but to “leave [the snake] alone” because it “was going to bite [Odom].” According to Perritt, Odom ignored the warning.[1] As Odom grasped the snake behind its head and dropped it into a bucket, he was repeatedly bitten on both hands. One of the crew members later measured the snake and determined that it was six feet, three inches long.
Perritt drove Odom to the hospital in Brewton and Odom was later airlifted to USA Medical Center in Mobile where he was hospitalized until November 3, 2009. Odom was in a coma for the first two weeks of his hospitalization. He remained in the intensive-care unit for 35 of the 40 days that he was in the hospital. He experienced, among other problems, a “frozen” shoulder and extensive and prolonged swelling of his hands and arms. After his discharge from the hospital, Odom participated in physical therapy at D.W. McMillan Memorial Hospital from January 15, 2010, until March 5, 2010. Before engaging in physical therapy, Odom had experienced no disabling pain in his neck or shoulders. During physical therapy, Odom complained of pain in his neck and upper back, and he experienced a popping in his neck. Odom also complained to his personal physician that physical therapy was causing him pain in his neck and upper back.
The trial court ultimately determined that Odom was permanently and totally disabled as a result of injuries to his hands, arms, shoulder, upper back, and neck. Because Mercy does not challenge on appeal the trial court’s medical-causation or disability determinations, we have not set out the trial court’s findings and conclusions with respect to those issues.

Standard of Review

Our review of this ease is governed by the Act, which states, in pertinent part:
*912 “In reviewing the standard of proof ... and other legal issues, review by the Court of Civil Appeals shall be without a presumption of correctness.” Ala. Code 1975, § 25 — 5—81(e)(1). See also Ex parte Trinity Indus., Inc., 680 So.2d 262, 268 (Ala.1996). “In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence.” Ala.Code 1975, § 25-5-81(e)(2). Substantial evidence is “ ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ ” Ex parte Trinity Indus., 680 So.2d at 269 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989), and citing § 12-21-12(d), Ala.Code 1975).

Discussion

For an injury to be compensable under the Act, the injury must be caused by “an accident arising out of and in the course of [the] employment.” § 25-5-51, Ala.Code 1975.
“Upon considering the meaning of the complete expression ‘arising out of and in the course of his employment,’ and of its separate component parts, it should be observed that while an accident arising out of an employment usually occurs in the course of it, such is not invariably true. Likewise, an accident which occurs in the course of an employment does not necessarily arise out of it. The words ‘arising out of involve the idea of causal relationship between the employment and the injury, while the term ‘in the course of relates more particularly to the time, place and circumstances under which the injury occurred. The phrases are not synonymous; where both are used conjunctively a double condition has been imposed, and both terms must be satisfied in order to bring a case within the act. 58 AmJur. 717. Generally, an injury arises out of an employment only when there is a causal connection between the injury and the conditions under which the work is required to be performed.”
Wooten v. Roden, 260 Ala. 606, 610, 71 So.2d 802, 805-06 (1954). We will address the second part of the compensability test first.
A. “In the Course of’ Employment
“An injury to an employee arises in the course of his employment when it occurs[ ] within the period of his employment, at a place where he may reasonably be and while he is reasonably fulfilling the duties of his employment or engaged in doing something incident to it.”
Carraway Methodist Hosp. v. Pitts, 256 Ala. 665, 671, 57 So.2d 96, 101 (1952). The evidence in the present case indicates that Mercy provided its employees with transportation to and from work pursuant to an implied contractual obligation; Perritt testified that Mercy considered the employees’ travel to and from work to be on-the-job time. Although “accidents occurring while a worker is traveling on a public road while going to or coming from work generally fall outside the course of the employment,” McDaniel v. Helmerich & Payne Int'l Drilling Co., 61 So.3d 1091, 1093 (Ala.Civ.App.2010) (citing Turner v. Drummond Co., 349 So.2d 598, 603 (Ala.Civ.App.1977)), there is an exception to the “going and coming rule” when the employer furnishes transportation to and from work pursuant to an implied contractual obligation, see Ammons v. McClendon, 263 Ala. 651, 652, 83 So.2d 239, 240 (1955). Therefore, Odom’s accident occurred within the period of his employment (on the drive back to Brewton after work) and in a place where he might reasonably be (on the road from the job site to Brewton).
*913 The more difficult question is whether, in attempting to catch a rattlesnake, Odom was “reasonably fulfilling the duties of his employment or engaged in doing something incident to it.” Carraway Methodist Hosp. v. Pitts, 256 Ala. at 671, 57 So.2d at 101. “[T]he courts have decided that the course of the employment is not limited solely to the services for which the employee was retained, but includes any act expressly or implicitly authorized by the employer.” 1 Terry A. Moore, Alabama Workers’ Compensation § 11:50 at 417 (1998).[2]
Because Odom’s foreman abandoned his plan to run over the snake and kill it and, instead, stopped the labor truck and pulled off the road after two employees expressed a desire to catch the snake, it can be inferred that Mercy impliedly consented to the snake-catching activity. Cf. State Parks & Wildlife Dep’t v. Tidwell, 735 S.W.2d 629, 631-32 (Tex.App.1987). In Tidwell, state game wardens took an intoxicated hunter into custody, and, while transporting him to jail, they saw a large rattlesnake on the highway. The hunter told the wardens, “‘[T]urn around, I’ll catch that snake,’ ” whereupon the warden who was driving the car “turned the vehicle around and headed it back in the direction of the snake.” 735 S.W.2d at 630. The Texas appellate court stated:
“There was evidence to the effect that [the warden] turned the car around when [the hunter] made the suggestion that he would catch the snake. [The warden] then proceeded to park the car on the edge of the road within twenty feet of the snake. This created a situation in which it could be inferred that [the warden] in his supervisory capacity ([the hunter] being his prisoner) was going back for the purpose of allowing [the hunter] to catch the snake.... It could be inferred that [the warden’s] parking of the vehicle at that location not only enabled [the hunter] to catch the snake, but was an encouragement and tacit approval of [the hunter’s] action.”
Id. at 631-32.
The implied-consent rationale is, however, limited by the requirement that, “although the employer may have implicitly authorized an activity, if the employer receives no direct or indirect economic benefit from the activity, it does not become part of the employment.” Moore, Alabama Workers’ Compensation § 11:50 at 421 (citing Foster v. Continental Gin Co., 261 Ala. 366, 74 So.2d 474 (1954)) (holding that an injury sustained by an employee who was making a lamp stand for himself — an activity customarily permitted by the employer — nevertheless did not occur in the course of employment because the employer derived no economic benefit from the employee’s activity).
*914 “The courts have not devised a clear test to distinguish indirectly beneficial activities intended to be within the [indirect-benefit] theory, from purely remote ones outside the doctrine. However, the fact that the employee deems the act indirectly beneficial to his or her employer is not of itself sufficient to fasten liability upon the company. Employees may devise any number of ingenious or creative arguments to prove how their activity .has benefited their employer, but unless the activity actually furthers the economic objectives of the employer, it will not be considered work-related.”
Moore, Alabama Workers’ Compensation § 11:51 at 423 (footnotes omitted).
Odom’s counsel argued to the trial court and now maintains on appeal that removing the poisonous snake from the roadway (whether by catching it or killing it) on the afternoon of September 24, 2009, furthered the economic objectives of Mercy because snakes are an occupational hazard to loggers in the woods, and, he pointed out, the snake on the roadway was several hundred yards from (and facing in the direction of) the job site where the Mercy loggers would be working the following morning. The suggestion that Odom’s snake-catching activity was tantamount to safeguarding the job site assumes that, unless it was caught and removed from the roadway, the same snake would likely have been present on the job site 12 hours later when the logging crew arrived. We question whether an activity that produces such a speculative and remote benefit to the employer falls within the indirect-benefit rule. Cf. Elliott v. Darby, 382 S.W.2d 70, 76 (Mo.Ct.App.1964) (holding that any good will that may have accrued to the employer, the owner of an automobile dealership, as a result of his employee’s participation in a community boat-dock project aimed at promoting recreation and tourism along the river where the dealership was located was speculative and remote, and stating that the indirect-benefit rule “cannot be applied without limitation. Eventually the indirect benefit to the employer becomes so tenuous as to be imperceptible.”).
Further, to posit that, for purposes of the economic-benefit rule, catching a poisonous snake is no different from killing the snake because either action results in the removal of a potential hazard from the employer’s job site is to turn the economic-benefit rule on its head. Even assuming that Mercy’s job site was potentially benefited as a consequence of Odom’s ridding the area of one dangerous snake, that potential benefit appears to be outweighed by the potential detriment to Mercy that could (and did, in this case) result from losing the services of a valued employee who might have been seriously injured while trying to catch the snake.
In an early Alabama case our supreme court stated:
“[T]he effect of well-considered cases is that an employee does not step aside from his employment, and is without the protection of the statute, when he is doing a reasonably necessary act at the time and place to the end that the work and business of the employer may be properly conducted or preserved, or the safety and health of the human and physical agencies engaged therein be conserved, and the ways, works, machinery, or plant safeguarded. In such a temporary deviation by the employee from the original employment or a temporary departure by him from his usual vocation, in the performance of some work for the employer, he is yet acting within the course of his employment.”
Ex parte Majestic Coal Co., 208 Ala. 86, 88, 93 So. 728, 729 (1922) (emphasis added) (holding that miner’s injury, sustained when he pulled loose rock from the en *915 trance to a coal mine, occurred “in the course of his employment,” despite the facts that he had never been instructed to remove the rock, that his job duties did not include that task, and that other employees had customarily performed and had been paid for such work). Unlike the employee in Majestic Coal, who saw an imminently dangerous condition and attempted to abate it for the safety of himself and other employees, Odom and his fellow employees were not performing “a reasonably necessary act” when they left the security of the vehicle in which they were traveling and chose to confront a poisonous snake that presented no imminent threat to them or to any other employee of Mercy.
Although we entertain some doubt about the correctness of the trial court’s conclusion that Odom’s snake-catching activity occurred “in the course of’ his employment, we will assume, without deciding, that it did so occur and proceed to address whether that activity “arose out of’ Odom’s employment.
B. “Arising Out of ’ Employment
“Whether an accidental injury ‘arises out of the claimant’s employment is basically a question of whether there is a causal relationship between the claimant’s performance of his or her duties as an employee and the complained-of injury.” Ex parte Trinity Indus., 680 So.2d at 266. “Legal causation refers to the standard used by the courts to determine if the risk causing the injury is sufficiently related to the employment to be considered an occupational hazard.” Moore, Alabama Workers’ Compensation § 10:2 at 815 (emphasis added). “[T]he employment should be considered the legal cause of the injury for workers’ compensation purposes only when the injury results from an occupational risk.” Id., § 10:5 at 318 (emphasis added; citing, among other cases, Young v. Mutual Sav. Life Ins. Co., 541 So.2d 24, 26 (Ala.Civ.App.1989) (stating that an injury arises out of employment if it arises “from any risk or danger incidental to the character of ... employment”)).
In Young, a traveling salesman who was taking a lunch break under a shade tree on the side of the road was injured when he fell into a ditch on his way to look at some ripe blackberries in a nearby field. This court held that the accident occurred “in the course of’ the salesman’s employment, but that it did not “arise out of’ the salesman’s employment, because
“[t]he possibility of slipping and falling into a roadside ditch is not a hazard peculiar to traveling salesmen. Clearly the claimant, although primarily carrying on his employer’s business, i.e., he continued on his route after the fall, had departed on his own personal enterprise at the time of the injury.”
541 So.2d at 26-27 (citing Gumbrill v. General Motors Corp., 216 Minn. 351, 13 N.W.2d 16 (1944)).
The trial court’s judgment contains the following findings of fact:
“11. Aaron Perritt testified that rattlesnakes are an occupational hazard, threat, and danger to him and the other workers in his logging crew when working in the woods. Odom agrees with Perritt that rattlesnakes are a hazard, threat and danger to him while he worked for Mercy. It is the policy of Mercy to remove rattlesnakes from its employees’ work environment, and in the past it has removed rattlesnakes by killing them. Prior to September 24, 2009, Aaron Perritt has killed many snakes while working for Mercy, including running over snakes with Mercy’s labor truck while leaving job sites in the woods. In addition, Winston Perritt and other employees of Mercy have killed snakes on or near Mercy’s job sites. *916 Winston Perritt keeps a shotgun in his truck to kill snakes while working. An incident occurred before September 24, 2009, when Aaron Perritt was leaving a job site at the conclusion of the work day and stopped his labor truck in the road and allowed Raines to kill a rattlesnake. Aaron Perritt testified that snakes crawling on the roadway toward a Mercy job site in the near vicinity of the job site are potentially more dangerous to Mercy employees than snakes not located near the job site. Aaron Perritt testified that he kills rattlesnakes rather than catching them, but he testified that whether they are killed or caught, the important consideration is to remove them to eliminate the threat that they pose to the employees.”
(Emphasis added.)
The foregoing findings focus on the occupational hazard that snakes present to Mercy’s employees when the employees are conducting logging operations in the woods. Odom’s injury, however, did not occur while he was conducting logging operations or while he was in the woods. Odom acknowledged at trial that catching a rattlesnake on a public roadway was not an activity caused by his employment. During questioning by the employer’s counsel, Odom testified:
“Q. Now, if [Nelson or Raines] wanted to catch a snake, why [were] you involved in catching the snake?
“A. Well, we all kind of got caught up in that, I guess....
“Q. Now what’s the purpose of catching of a snake? Why would you want to catch it as opposed to kill it?
“A. Well, that’s a good question, I guess.
“Q. Okay.
“A. Kind of a dumb thing.
“Q. Okay. Did catching a snake have anything to do with getting your job done at Mercy Logging?
“A. No, sir.
“Q. That wasn’t going to put timber on the truck, was it?
“A. No, sir. I wish we would have just kept going.
“Q. Okay. It wasn’t keeping /all from doing your work, because /all were already in the truck on the black top. Y’all could have just kept on going.
“A. Yes, sir. We could have, but we stopped.
“Q. We stopped. Anybody force you to get out of the truck?
“A. No, sir....”
Odom further testified:
“Q. Okay. Was it part of [your] job duties to catch that snake?
“A. No, sir.
“Q. Was that snake in any way interfering with your ability to perform your job duties [of] cutting timber and loading up and driving to the paper mill or what have you?
“A. No, sir. I wish we would have just went on and hadn’t stopped.
“Q. Was there any business reason, work reason to catch that snake?
“A. Not that I know of.”[3]
The trial court’s judgment contains the following conclusions of law concerning the compensability of Odom’s injuries:
“20. The Court finds that rattlesnakes were an occupational hazard to Odom and other employees of Mercy *917 while employed by and working for Mercy, and Odom’s employment with Mercy contributed to the hazard of a rattlesnake bite and materially increased Odom’s risk of exposure to a rattlesnake bite.... The Court finds that Odom was bitten by the rattlesnake at a time and at or near a place and while performing an activity for which he was hired by Mercy, that he caught the rattlesnake with the express or implicit authorization and acquiescence of Mercy, and that Mercy and its employees received an economic benefit by Odom’s activity in removing the rattlesnake from or near Mercy’s job site. The Court finds that the personal injuries and disability suffered by Odom arose out of and in the course of his employment with Mercy.”
The foregoing determinations actually address only that portion of the compensability test that is concerned with whether Odom’s accident occurred “in the course of’ his employment, not with whether the accident “arose out of’ his employment. “It is well settled that an accident may occur in the course of ... employment without arising out of it. In order to be compensable the accident must have the two concurring incidents.” Bell v. Tennessee Coal, Iron, & R.R., 247 Ala. 394, 396, 24 So.2d 443, 444 (1945).
The trial court’s determinations that rattlesnakes are an occupational hazard to loggers and that Odom’s employment with Mercy “materially increased Odom’s risk of exposure to a rattlesnake bite” do not address the material question presented by this case, namely: whether Odom’s occupational risk of being bitten by a snake during logging operations in the woods had any causative relation to the snake bite that Odom actually suffered on September 24, 2009, when he voluntarily left the safety of the vehicle in which he was a passenger and attempted to catch a snake that was lying on the roadway. That question must be answered in the negative. The snake on the roadway posed no risk — occupational or otherwise — to Odom so long as he remained in the vehicle in which he was riding; once he voluntarily exited' the vehicle and attempted to catch the snake, the risk that caused Odom’s injury was personal to him and not “sufficiently related to [his] employment to be considered an occupational hazard.” Moore, Alabama Workers’ Compensation § 10:2 at 315 (citing Dallas Mfg. Co. v. Kennemer, 243 Ala. 42, 44, 8 So.2d 519, 520 (1942)) (stating that “[t]he question always is whether [the] employment specially subjected [the injured employee] to a hazard of [the] sort [that caused the injury]”). The hazard that Odom encountered on September 24, 2009, was not peculiar to loggers; it was one that would be shared by any passing motorist who, after having spied a snake on the roadway, alights from his or her vehicle and undertakes to catch the snake. See Union Camp Corp. v. Blackmon 289 Ala. 635, 639, 270 So.2d 108, 111-12 (1972) (“The risk to which the employee was subjected on his trip to obtain a soft drink was a risk shared by anyone riding in an automobile, and it was not a risk arising from his employment by Union Camp. The fact that he was within the hours of his employment, and was subject to recall, is not controlling. Such fact or facts do not change the necessary conclusion that Blackmon’s employment in no wise exposed him to the risk causing his fatal injuries.”); Young v. Mutual Sav. Life Ins. Co., 541 So.2d at 26-27 (“The possibility of slipping and falling into a roadside ditch is not a hazard peculiar to traveling salesmen. Clearly the claimant, although primarily carrying on his employer’s business, i.e., he continued on his route after the fall, had departed on his own personal enterprise at the time of the injury.”).

*918
Conclusion

Because Odom’s accident did not arise out of his employment with Mercy, the trial court erred in determining that his injuries were compensable, in awarding him benefits under the Act, and in awarding his counsel attorney’s fees. The judgment of the Escambia Circuit Court is reversed, and the cause is remanded for entry of a judgment in favor of Mercy.
REVERSED AND REMANDED.
THOMPSON, P.J., and THOMAS, J., concur.
BRYAN and MOORE, JJ., concur in the result, without writings.

. Odom testified that he did not hear Perritt warn him. The trial court resolved that dispute in favor of Odom. It found:
"It is undisputed that Perritt first intended to run over the snake with the truck and kill it, but when one or more of the employees told him that they wanted to catch it, Perritt veered away from the snake, stopped the truck, turned the ignition off, and exited the truck with the other employees and walked to the snake, knowing that someone was going to catch the snake. These actions of Perritt are inconsistent with Perritt’s testimony that just a few seconds or minutes later he told Odom not to catch the snake. The court finds from the testimony and from its observation of the witnesses that Aaron Perritt never instructed Odom that he should not or must not catch the rattlesnake.”

. The implied-consent rationale also applies to "horseplay.”
"[T]he course of the employment includes all activities impliedly authorized by the employer through its acquiescence with full knowledge. Thus, it appears that in Alabama law even an instigator or participant [in horseplay] is entitled to compensation if the horseplay was a regular incident of the employment, of which the employer had actual or constructive notice, as distinguished from an isolated act, or, if the employee can prove that the employer impliedly consented to the activity even the first time it took place since it was a characteristic feature of the employment."
Moore, Alabama Workers' Compensation, § 11:71 at 443-44 (emphasis added; footnotes omitted). To the extent that the snake-catching activity can be considered analogous to "horseplay,” we note that there was no evidence indicating that catching snakes, as opposed to killing snakes, was a regular incident of the employment or that Mercy ever impliedly consented to such activity before the day of Odom’s injury.

. Odom later acknowledged that one might want to catch a snake to keep it alive so that it could be eaten. Perritt testified that Nelson had skinned the snake that had bitten Odom, and Nelson "still ha[d] the hide.” Perritt said that he, Nelson, and Raines "were going to make [Odom] a belt but never did get around to it.”